# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* J. DOE1 and J. DOE2, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. |
| CMG RX LLC, CCMGRX, LLC, RICHARD CESARIO, JOHN COOPER, 360 PHARMACY SERVICE, LLC, TRILOGY PHARMACY, INC., FW MEDICAL SUPPLIES, LLC, and WEISE PRESCRIPTION SHOP, INC., | ) ) ) ) ) ) ) | **FILED IN CAMERA AND UNDER SEAL** |
| Defendants. | ) ) | JURY TRIAL DEMANDED |

## COMPLAINT

On behalf of the United States of America and themselves, Relators J. Doe1 and J. Doe2 ("Relators") file this *qui tam* complaint against CMG Rx, LLC, CCMGRX, LLC, Richard Cesario, John Cooper, 360 Pharmacy Services, LLC, Trilogy Pharmacy, Inc., FW Medical Supplies, LLC, and Weise Prescription Shop, Inc. ("Defendants"), and allege as follows:

## INTRODUCTION

1.     This is a civil action to recover damages and penalties on behalf of the United States of America arising from false claims and statements made, caused and/or presented by the Defendants in violation of the Federal False Claims Act

1

Case 4:15-cv-01349   Document 1 *SEALED*   Filed in TXSD on 05/19/15   Page 2 of 57

("FCA"), 31 U.S.C. § 3729 *et seq*.

2.     The FCA allows an individual known as a relator, or whistleblower, to file an action on behalf of the government for violations of the FCA and receive a portion of any recovery as an award to the *qui tam* plaintiff. 31 U.S.C. § 3730. Under the FCA, the Complaint must be filed under seal (without service on the defendants) to enable the government to conduct its own investigation without the defendants' knowledge and to allow the government an opportunity to intervene in the action.

3.     Defendants have violated the FCA by engaging in a scheme to improperly offer, pay and/or receive compensation for the purpose of inducing the ordering or prescription of compounded drugs and other healthcare services for which reimbursement was sought from federal healthcare programs, specifically the TRICARE Program. This conduct violates the Anti-Kickback Statute and Defendants were prohibited from submitting claims to TRICARE that were generated through these illegal arrangements. Despite knowing that these claims were prohibited, Defendants submitted or caused to be submitted and received millions of dollars in improper payments from TRICARE.

## JURISDICTION AND VENUE

4.     Relators bring this action on behalf of themselves and the United States of America pursuant to 31 U.S.C. § 3730(b)(1).

5.     This Court has subject matter jurisdiction over Plaintiffs' claims arising under the False Claims Act, 31 U.S.C. § 3729 *et seq*., pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. § 1331 and 1345. The Court has supplemental jurisdiction to entertain

Case 4:15-mc-02312   Document 1 - SEALED   Filed in TXSD on 05/19/15   Page 3 of 57

common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

6.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, and/or have transacted business within this Court's jurisdiction.

7.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a) because at least one Defendant resides in this district and because alleged violations of the FCA occurred in this district.

## DEFENDANTS

8.      Defendants **CMG Rx, LLC and CCMGRX, LLC** (collectively, "CMG"), also doing business as Compound Marketing Group, are Texas limited liability companies with their primary place of business located at 5050 Quorum Drive, Suite 700, Dallas, Texas 75254. CMG Rx, LLC and CCMGRX, LLC, while distinct legal entities, operate as one business entity, share common ownership and management, and conduct business under the common name "CMG." CMG's primary business is providing marketing services for compounding pharmacies. CMG was originally formed in July 2014 and initially owned by KA Enterprises, LLC, whose sole members and owners were Richard Cesario, Ken Riley and Adam Silva.

9.      Defendant **Richard Cesario** is an individual residing in Texas and is an owner of CMG. Cesario is also CMG's CEO and Treasurer.

10.     Defendant **John Cooper** is an individual residing in Texas and an owner of CMG. Cooper is listed as CMG's President and Secretary.

11.     Defendant **360 Pharmacy Service LLC is** a Texas limited liability

company with its primary place of business located in Webster, Texas. 360 Pharmacy Service is a compounding pharmacy that creates and sells compounded pharmaceutical products.

12.     Defendant **Trilogy Pharmacy, Inc.** is a Texas company with its primary place of business located in Dallas, Texas. Trilogy Pharmacy is a compounding pharmacy that creates and sells compounded pharmaceutical products.

13.     Defendant **FW Medical Supplies, LLC**, doing business as **Dandy Drug**, is a Texas limited liability company with its primary place of business located in Burleson, Texas. Dandy Drug is a compounding pharmacy that creates and sells compounded pharmaceutical products.

14.     Defendant **Weise Prescription Shop, Inc.** a Florida corporation with its primary place of business located in Jacksonville, FL. Weise Prescription Shop is a compounding pharmacy that creates and sells compounded pharmaceutical products.

15.     The Defendants identified paragraphs 11 through 14 are referred to collectively as the "Pharmacy Defendants."

<u>**THE RELATORS**</u>

16.     The Relators, **J. Doe1 and J. Doe2,** are individuals with non-public information regarding the violations of the False Claims Act described herein. Relators have used pseudonyms to file this Complaint because they fear professional and personal retaliation, but have freely made their identities known to the government to vigorously assist with the investigation and prosecution of this action.

17.     As defined in 31 U.S.C. § 3730(e)(4)(B), Relators qualify as the "original source" of the allegations made herein. Specifically, the violations alleged herein are based upon Relators' personal knowledge, expertise in the medical field, and non-public documents made available to Relators during the course of their dealings with Defendants. Relators provided the information that forms the basis of the allegations made herein to the federal government prior to filing this Complaint.

## BACKGROUND

### A.     The TRICARE Program

18.     The TRICARE Program, formerly known as the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), is a health care program of the United States Department of Defense Military Health System. TRICARE offers pharmacy and medical benefits to active duty personnel and their dependents, military retirees and their dependents and survivors, as well as reservists and members of the National Guard and their dependents.

19.     The TRICARE Program was managed by Tricare Management Activity (TMA) under the authority of the Assistant Secretary of Defense (Health Affairs). On October 1, 2013, TMA responsibility for TRICARE was transferred to the Defense Health Agency (DHA), which was established on the same day.

20.     The Department of Defense (DOD) is required by law to make all clinically appropriate prescription drugs available to TRICARE beneficiaries and, with the exception of several classes of drugs, DOD covers all FDA-approved drugs.

21.     TRICARE beneficiaries may obtain drugs through network and non-

Case 4:15-mc-02312-9   Document 1 - SEALED   Filed in TXSD on 05/19/15   Page 6 of 57

network retail pharmacies, Military Treatment Facility (MTF) pharmacies, and TRICARE's mail-order pharmacy through the TRICARE pharmacy benefit. In addition, through TRICARE's medical benefit, TRICARE beneficiaries may obtain drugs in outpatient or inpatient settings, such as civilian physicians' offices, hospitals and MTFs.

### B.     Compounded Products

22.     Compound drugs consist of a combination of two or more ingredients and are prepared by a licensed pharmacist for a patient's individual needs. Compounded drugs, pharmaceuticals, and other compounded products are referred to collectively herein as "compounded products."

23.     Compounded products are not individually approved by the Food and Drug Administration (FDA), and contain active ingredients that may or may not be approved by the FDA.

24.     Compounded products include non-sterile preparations, such as capsules, ointments, creams, gels, and suppositories, which are typically dispensed in pharmacy settings. Compounded products may also be sterile compounded preparations that include intravenously administered fluids and injectable drugs, which are typically administered in both inpatient and outpatient settings.

25.     According to a Government Accountability Office (GAO) Report, prescription compounded products paid for by TRICARE's pharmacy benefit cost "$259 million in fiscal year 2013—accounting for about 3 percent of the total cost of all prescription drugs paid for through TRICARE's pharmacy benefit—up from $5

Case 4:15-cv-01349   Document 1-SEALED   Filed in TXSD on 05/19/15   Page 7 of 57

million in fiscal year 2004." Government Accountability Office, "TRICARE's Payment Practices Should Be More Consistent with Regulations," GAO-15-64, *available at* http://www.gao.gov/assets/670/666339.pdf.

26.    The vast majority—85 percent—of compounded product claims submitted to TRICARE in FY 2013 were filled by retail pharmacies.

27.    TRICARE reimburses providers for compounded products at either the lesser of the billed charges or 95 percent of Average Wholesale Price (AWP) for each active ingredient as determined by ingredients' National Drug Codes for compounded products administered in civilian outpatient settings.

28.    The average cost of a compounded product that included at least one bulk drug substance was $557 per prescription compared to an average cost of $53 per prescription for a compounded product that contained only FDA-approved products.

29.    According to some reports, the cost to TRICARE for compounded products has grown to over $300 million *per month* by Spring 2015.

## C.    The Anti-Kickback Statute

30.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits the knowing offer or payment of any remuneration in exchange for referrals for a healthcare service for which payment is made by any federally funded healthcare program, including Medicare, Medicaid, and TRICARE.

31.    Specifically, the Anti-Kickback Statute prohibits providers, such as hospitals, from paying remuneration to a referral source, such as a physician, where one purpose of the compensation is to induce referrals for healthcare services paid for

Case 4:15-mc-02301-49 Document 1-SEALED Filed 05/19/15 in TXSD Jx55 19/Page age 83 of 57

by a federally-funded healthcare program.

32.    The Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. 42 U.S.C. § 1320a-7b(b)(3).

33.    Compliance with the Anti-Kickback Statute is a condition of payment for every claim submitted to a federally-funded healthcare program, including TRICARE.

34.    The submission of claims for reimbursement to a federal healthcare program, including TRICARE, requires compliance with the Anti-Kickback Statute as an express and implied prerequisite for reimbursement. As such, a violation of the Anti-Kickback Statute that results in claims being submitted to a federal healthcare program is a violation of the federal False Claims Act.

35.    Providers that submit claims to TRICARE, including claims for reimbursement for compounded products, expressly and impliedly represent that the claims do not violate the Anti-Kickback Statute. As a result, claims that were generated in violation of the Anti-Kickback Statute and submitted to TRICARE for reimbursement are factually false.

## **DEFENDANTS' MISCONDUCT**

36.    Defendants engaged in numerous kickback arrangements designed to provide illegal compensation to induce and incentivize claims for compounded products, which were submitted to, and paid by, the TRICARE Program.

37.    Defendants knowingly submitted, or caused to be submitted, false

Case 4:15-cv-01349   Document 1   Filed on 05/19/15 in TXSD   Page 9 of 23

claims for compounded products to TRICARE from January 1, 2014 through the present that were generated through the illegal compensation arrangements described herein.

38.     Defendants Cesario and Cooper were the primary owners and managers of CMG. Cesario and Cooper personally designed, approved, implemented, agreed to, and administered the illegal compensation arrangements described below.

### A.     Misclassifying Marketing Commissions as Employee Compensation

39.     Defendant CMG provides marketing and consultation services to compounding pharmacies. CMG entered into marketing service agreements with the Pharmacy Defendants that provided that the pharmacy will pay CMG a percentage of revenue from the sales of compounded products that are generated by CMG's efforts. **Exhibits A and D** are two examples of these agreements, which CMG has entered into with defendants 360 Pharmacy Services and Trilogy Pharmacy.

40.     CMG represents that it is affiliated—i.e., has entered into some type of ownership or commissions-based marketing arrangement—with at least 12 compounding pharmacy locations located throughout the United States.

41.     Medicare, Medicaid, and many other commercial health insurers have limited reimbursement for compounded products. As a result, CMG engaged in a scheme to target TRICARE patients to sell compounded products. Reimbursement from TRICARE comprises the majority of the reimbursement for the compounded products marketed by CMG. According to comments made by CMG employees in the Spring 2015, including statements by Defendants Cesario and Cooper, it is believed

that CMG's illegal marketing efforts have generated over $300 million in claims to TRICARE for compound products.

42. Because the Anti-Kickback Statute prohibits the payment of remuneration from one entity to another in exchange for referrals or other business that is paid for by a federal healthcare program, CMG structures its marketing agreements to falsely claim that the pharmacy is hiring one or more of CMG's employees, agents, or principals as part-time employees. **Exhibit A** is an example of this type of agreement; although it purports to be an agreement for defendant 360 Pharmacy Services to hire a part-time employee, the marketing representative is really an employee or contractor of CMG and the agreement provides for 360 Pharmacy Services to pay CMG a percentage of the compound product sales generated by CMG's marketing efforts.

43. Despite how CMG worded its marketing services contracts, CMG's employees do not meet the criteria for part-time employment by the Pharmacy Defendants, and the compensation provided to CMG and its employees and principals is intended to induce referrals in violation of the Anti-Kickback Statute.

44. CMG, through its employees and agents, obtains lists of TRICARE beneficiaries and uses telemarketing and other high-pressure sales tactics to encourage the patients to switch from non-compounded medications to more expensive compounded products.

45. CMG, through its employees and agents, contacts physicians in order to convince the physicians to prescribe compound products, especially to their TRICARE

patients.

46.    CMG entered into commissions-based marketing agreements with each of Pharmacy Defendants. The majority of the prescriptions for compounded products that were generated by CMG and filled by the Pharmacy Defendants were paid for by the TRICARE program. Each of these compensation arrangements, because they provided for the Pharmacy Defendants to pay CMG based upon revenue, violated the Anti-Kickback Statute.

47.    CMG has created several programs that are designed to increase sales of compound products through payments to physicians and TRICARE patients that are disguised as payments for physician services or clinical studies and assessments. One purpose of the compensation provided through these programs is to induce prescriptions and claims for compounded products, which are submitted to TRICARE for reimbursement. The Pharmacy Defendants were aware that CMG is generating prescriptions for compounded products through illegal payments to physicians and TRICARE patients. Alternately, the Pharmacy Defendants are responsible for CMG's illegal marketing practices under agency principals.

**B.    Illegal Consultation Payments to Physicians**

48.    CMG pays compensation to prescribing physicians in order to induce or incentivize prescriptions and orders for its compounded products by entering into consultation agreements with physicians that provide for a $60 payment for each patient consultation completed by the physician. A copy of one such consultation agreement is attached hereto as **Exhibit B**.

49.    These consultation payments are based on or take into account the number of patients to whom the physician prescribes compounded products sold by CMG and the Pharmacy Defendants.

50.    The $60 consultation payment also exceeds fair-market value because the compounding product "consultation" provided by the physician is an unwarranted or unnecessary physician service and/or reimbursed by other sources, such as the patient's healthcare insurance.

### C.    Clinical Study Payments to Patients and Physicians

51.    CMG also created a sham clinical trial or patient assessment program that was designed to provide compensation to prescribing physicians and TRICARE patients to induce or incentivize orders for compounded products. This sham study was named the "Patient Safety Initiative" or "PSI" study.

52.    CMG's employees and agents promised compensation to patients that began using Defendants' compounded products by offering to enroll the patients in a monthly assessment "study" and pay them $250-$450 per script for each monthly assessment completed by the patient and returned to CMG.

53.    Prior to or at the beginning of their enrollment in the PSI study, CMG required that each patient have a consultation with a physician, which resulted in compensation to a physician under the arrangement described in paragraphs 48 through 50. This compensation correlates with the number of patients that were prescribed compounded products and was intended to induce physicians into prescribing additional compounded products to their patients.

54.     CMG created a website, www.psihealthgroup.com, which served as a marketing tool and portal for patients to submit their monthly assessments. The website states "Join the PSI Movement by Becoming a Participant in Our Research Study Today! Each Qualified Participant May Receive Compensation! Enroll For FREE."

55.     CMG entered into study participant agreements with patients that agreed to enroll in the "Patient Safety Initiative" study. The agreements provided that the patient would be compensated $250-$450 per month per eligible compounded product prescription or "script." An eligible script was usually either a compounded pain cream, scar cream, or other compounded product. A copy of one such agreement, with the patient's information redacted, is attached hereto as **Exhibit C**.

56.     CMG enrolled numerous TRICARE patients in the PSI study and paid them monthly payments for completing and submitting one-page patient assessment forms all while TRICARE was paying thousands of dollars per month to CMG and the Pharmacy Defendants for each compounded product prescribed to these same TRICARE patients.

57.     CMG marketed the PSI study to TRICARE patients through direct solicitation and social media. An employee or agent of CMG created one such solicitation in February 2015 that read: "The patients who qualify for the medical study will receive $250 - $500 every time that they send in the assessment. The study lasts for 12 months which is worth $3000 or $6000 depending on the compound that is prescribed to the patient."

58.     A prescription for CMG's compounded products, and payment by the patient's insurer, was a prerequisite to enrollment in the PSI study.

59.     The PSI study was a sham clinical study that was not intended to generate useful scientific data; rather, it was created by CMG as a marketing tool to compensate patients and physicians to incentivize the ordering of the Pharmacy Defendants' compounded products.

60.     The PSI study violated federal law in numerous ways: it was not registered on clinicaltrials.gov; it was not overseen by an institutional review board; was not sanctioned or approved by any federal agency; it did not have a qualified principal investigator or other scientifically credentialed expert that designed or administered the study; and any data actually generated by the patients' assessment has and will not be used in a manner consistent with a *bona fide* medical study.

**D.     Specific Examples**

61.     Defendants engaged in a widespread pattern of fraudulent kickback arrangements designed to generate prescriptions for compounded products that were paid for by TRICARE. Paragraphs 63 through 68 identify the specific details of a small sample of the illegal claims submitted or caused by Defendants. Relators estimate that CMG had recruited over 5000 patients to receive compounded products through its kickback arrangements prior to May 1, 2015, and that at least 3500 of these were TRICARE patients.

62.     CMG solicited TRICARE patients to receive compounded products and to enroll in the PSI study and in the following states: Arizona Florida, Georgia,

Indiana, Massachusetts, Michigan, Nevada, New Mexico, Oklahoma, Pennsylvania, Rhode Island, Tennessee, Texas, and Utah.

63. **Patient C.D**. In February 2015, CMG's enrolled a TRICARE beneficiary with the initials C.D. in its PSI study. The patient was paid $250 in March 2015 and $750 in April 2015 based upon his receiving one compounded product and three compounded products in those same months, respectively (and for filling out the monthly assessment form). Claims for these compounded products were submitted to TRICARE by CMG or the affiliated pharmacy and TRICARE paid several thousand dollars for each compounded product.

64. **Patient G.S.** On or around August 16, 2014, CMG entered into an Assessment Compound Study Agreement with a patient whose initials are G.S. The Study Agreement provided that CMG will pay the patient $450 per month after the patient completes 30 days of treatment and for completing a short patient assessment form each month. The payment is contingent upon CMG collecting full reimbursement for the pain or scar compounding cream prescribed to the patient. In the event that the patient is prescribed both pain and scar compounded medications, the patient can fill out two assessments and receive up to $900 per month. Although the PSI study reimbursement was eventually lowered to $250 per script per month, this or a similar agreement was used by CMG for other patients enrolled in the study, including TRICARE patients. The agreement between CMG and patient-and-study-participant G.S. is **Exhibit B.**

65. **Trilogy Pharmacy, Inc. Agreement.** In July 2014, KA Enterprises

(subsequently, CMG; collectively referred to as "CMG" in this paragraph) entered into an agreement with Trilogy Pharmacy, Inc. to jointly employ the principals of CMG. The jointly-employed or "assigned" employees were responsible for providing compounded product marketing services to Trilogy. The agreement provided that Trilogy would also pay CMG a percentage of the sales generated by the efforts of CMG's employees. CMG generated prescriptions for compounded products that were filled by Trilogy and CMG was paid a percentage of the revenue generated by these claims. The majority of the claims generated through this arrangement were submitted to TRICARE by Trilogy. All claims generated through this arrangement and submitted to a federal healthcare program violated the Anti-Kickback Statute and FCA. A copy of the CMG-Trilogy services agreement is attached hereto as **Exhibit D**.

66. **Weise Prescription Shop Agreement**. In August, 2014, CMG entered into a marketing service agreement with defendant Weise Prescription Shop, Inc. The agreement was signed by Richard Cesario and John Cooper for CMG and by Gilber Weise, the owner of Weise Prescription Shop. The agreement provides that:

> [CMG] will be paid 60% of the gross adjudicated collected reimbursable revenue generated by CMG and sent to WPS starting from the execution of this agreement. This gross collected reimbursable revenue shall be paid by WPS to CMG via check sent Fedex Standard Overnight or ACH within 3 business days of funding to WPS account. Upon WPS receipt of 200 individual gross adjudicated collected reimbursable revenue, CMG compensation shall increase from 60% to 70%.

The CMG-Weise Prescription agreement also provides that, if "[Weise] receives a [sic] increase in the gross adjudicated collected reimbursable revenue after payment has

been received, CMG shall receive its proportionate 70% of that increase." Per the agreement, CMG will also be responsible for "payment of $60 to doctor per patient consult." CMG generated prescriptions for compounded products that were filled by Weise and CMG was paid a percentage of the revenue generated by these claims. The majority of the claims generated through this arrangement were submitted to TRICARE by Weise. All claims generated through this arrangement and submitted to a federal healthcare program violated the Anti-Kickback Statute and FCA.

67.     **360 Pharmacy Services Agreement**. Effective March 15, 2015, CMG entered into a marketing services agreement with 360 Pharmacy Services. Although the agreement was labeled as an agreement to hire several CMG employees as part-time employees of the pharmacy, the agreement was actually a marketing services agreement that provided for CMG, through payments to CMG's employee and its principals (Cesario and Cooper), to be paid commission-based compensation for the compounded product referrals generated to the pharmacy by CMG. The compensation structure to CMG under the arrangement was based on a percentage of compounded product revenue and, thus, is determined in a manner that takes into account the volume and value of business generated between CMG and pharmacy. CMG generated prescriptions for compounded products that were filled by 360 Pharmacy Services and CMG was paid a percentage of the revenue generated by these claims. The majority of the claims generated through this arrangement were submitted to TRICARE by 360 Pharmacy Services. All claims generated through this arrangement and submitted to a federal healthcare program violated the Anti-Kickback Statute

and FCA. The CMG-360 Pharmacy Services agreement is **Exhibit A**.

68.     **Payments to Dr. Ernesto Ordonez**. In August 2014, CMG entered

into a consulting agreement with Dr. Ernesto Ordonez, a physician practicing in

Jacksonville, Florida. The Agreement provides that CMG will pay Dr. Ordonez $60

for each patient consult provided by Dr. Ordonez. One purpose of this consulting fee

is to induce prescriptions for compounded medications from Dr. Ordonez to CMG and

its affiliated pharmacies. On information and belief, many of the patients that were

prescribed compounded products and other drugs by Dr. Ordonez were TRICARE

beneficiaries and TRICARE paid for the cost of most of the compounded products

prescribed by Dr. Ordonez and filled through the CMG arrangement. The CMG-

Ordonez agreement is **Exhibit B.**

COUNT I:     PRESENTMENT OF CLAIMS IN VIOLATION OF THE FEDERAL
             FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(A))

69.     Relators re-allege and incorporate by reference the allegations contained

in all previous paragraphs as if fully stated in this Count.

70.     This is a claim for treble damages and civil penalties under the False

Claims Act, 31 U.S.C. § 3729(a)(1)(A).

71.     By virtue of the acts described above, Defendants knowingly presented

or caused to be presented to the United States Government false or fraudulent claims.

72.     Such claims were false or fraudulent because the Defendants falsely

submitted the claims in violation of the Anti-Kickback Statute and certified that

claims were eligible for payment when they were not.

73.     The United States, unaware of the falsity of the claims made by the Defendants, paid Defendants for claims that would otherwise not have been allowed.

74.     By knowingly failing to comply with requirements upon which payment was contingent, each claim presented by Defendants was false.

75.     By knowingly, willfully or recklessly presenting, or causing other to present, false claims for payment to the United States, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendant has engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

76.     As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

77.     Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

78.     Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

COUNT II:    FALSE STATEMENTS IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(B))

79.     Relators re-allege and incorporate by reference the allegations contained

in all previous paragraphs as if fully stated in this Count.

80. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

81. By virtue of the acts described above, Defendant made, used, and caused to be made and used, false records and statements that were material and caused or contributed to improper payments of federal funding to Defendants. Specifically, Defendants knowingly expressly and impliedly certified that the TRICARE claims described herein did not violate the Anti-Kickback Statute when they did.

82. The United States, unaware of the falsity of the records and statements, paid Defendant for claims that would otherwise not have been allowed.

83. Payment by the United States for all Medicare and Medicaid claims submitted by Defendants was conditioned upon Defendants' compliance with the laws and regulations described herein.

84. By knowingly, willfully or recklessly making, or causing others to make, false statements and certifications material to the United States' decision to pay on false claims, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

85. As a direct and proximate result of Defendants' fraudulent and/or illegal

actions and pattern of fraudulent conduct, the United States has paid directly or indirectly false claims that it would not otherwise have paid.

86.    Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

87.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

### COUNT III:    RETENTION OF OVERPAYMENTS IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(G))

88.    Relators re-allege and incorporate by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

89.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

90.    By virtue of the acts described above, Defendants have knowingly concealed and/or knowingly and improperly avoided an obligation to transmit money to the federal government. Specifically, Defendants knew or should have known that they received millions of dollars in payments from TRICARE for claims that were prohibited by the Anti-Kickback Statute.

91.    Once known, even if the improper payments were not fixed or clearly defined, Defendants had an obligation to remit or report such funds to the government within sixty (60) days. Defendants have not reported or returned the improper payments described herein.

92.    By knowingly concealing and/or knowingly and improperly avoiding its

obligation to transmit money recovered to the federal government, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), to the damage of the treasury of the United States of America, by causing the United States to be deprived of funds that rightfully belong to the government.

93.     As a direct and proximate result of Defendants' fraudulent and/or illegal actions and fraudulent conduct, the United States has been deprived of funds to which it is lawfully entitled and which were improperly paid to Defendants.

94.     Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

95.     Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five-thousand five-hundred to eleven-thousand dollars ($5,500 - $11,000).

WHEREFORE, Relators request that judgment be entered against Defendants, ordering that:

a.     Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*.;

b.     Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

c.     Relators are awarded the maximum amounts allowed pursuant to 31 U.S.C. § 3730(d);

d.      Relators are awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

e.      Defendants are enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

f.      Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

g.      The United States and Relators recover such other relief as the Court deems just and proper.

<u>JURY DEMAND</u>

A trial by jury is hereby demanded.


Dated:   May 19, 2015                           KREINDLER & ASSOCIATES

                                               By: _____
                                                   Mitchell R. Kreindler
                                                   *mkreindler@blowthewhistle.com*
                                                   9219 Katy Freeway, Suite 206
                                                   Houston, TX 77024-1514
                                                   Phone: (713) 647-8888
                                                   Fax: (713) 647-8889

                                                   LEVY KONIGSBERG LLP
                                                   Alan J. Konigsberg
                                                   *akonigsberg@levylaw.com*
                                                   Brendan E. Little
                                                   *blittle@levylaw.com*
                                                   800 Third Ave., 11th Floor
                                                   New York, NY 10022
                                                   Phone: (212) 605-6200
                                                   Fax: (212) 605-6290

                                                   *Attorneys for the Relators*